L. Timothy Fisher (SBN 191626)
ltfisher@bursor.com
BURSOR & FISHER, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: 925.300.4455
Fax: 925.407.2700

Joseph I. Marchese (*pro hac vice* forthcoming)
jmarchese@bursor.com
Philip L. Fraietta (*pro hac vice* forthcoming)
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, NY 10019
Tel: 646-837-7150
Fax: 212-989-9163

*Counsel for Plaintiff and the Putative Class*

*Additional Counsel Listed on Signature Page*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA C. DE LA CABADA and DEBRA WILLIAMS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>YTEL, INC., a California corporation,<br><br>*Defendant*. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**(1) Violations of the Telephone Consumer Protection Act**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs Laura C. De la Cabada and Debra Williams ("Plaintiffs") bring this Class Action

Complaint and Demand for Jury Trial against Defendant Ytel, Inc. to seek relief from numerous

unsolicited phone calls to their wireless numbers in violation of the Telephone Consumer Protection

Act, 47 U.S.C. § 227. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief.

**NATURE OF THE ACTION**

1.      Defendant Ytel is a cloud-based text messaging and calling system that directly facilitates the creation of telemarking campaigns to consumers, and executes calls and texts for those campaigns *en masse.* Predictably, Ytel's system can place prerecorded phone calls and send text message advertisements to cellular telephone numbers in an automated manner.

2.      According to Ytel, it "delivers more than 1 billion monthly messages" to consumers nationwide, in both call and text form. Nonetheless, millions of these calls and messages are sent without first obtaining the call recipient's consent, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA").

3.      Ytel has actual knowledge of this unlawful conduct, which has resulted in citations from the FCC and numerous lawsuits against its partners for violating the TCPA. Nonetheless, Ytel knowingly permits and facilitates such calls. Worst of all, Ytel actively takes part in executing robocall and texting messaging campaigns, providing tools that allow the use of deceptive calling tactics and the ability to avoid carrier spam blocking filters for texts and calls; explicitly offering auto-dialer and pre-recorded voice broadcasting services; and promising to provide everything needed to call and/or message multiple telephone numbers at once.

4.      In short, Ytel knowingly provides (and encourages) a turnkey spam calling and texting platform that it knows full well will be used to bombard consumers with unwanted contacts.

5.      For years, Manasseh Jordan Ministries and Yakim Manasseh Jordan (collectively "MJM"), a "ministry" and evangelizer of the so-called "prosperity gospel," have partnered with Ytel to make millions of spam phone calls and text messages. Between 2015 and 2017 alone, Ytel and MJM placed over *160 million* illegal robocalls to consumers around the country. And despite being subject to an FCC citation and no fewer than sixteen separate lawsuits since 2013, MJM continues to regularly bombard consumers with spam texts and calls—in exclusive partnership with, and with the knowing consent and assistance of, Defendant Ytel.

6.      As a result, Ytel has violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 by knowingly permitting and facilitating this conduct to persist, allowing their call platform to be used to effectuate this conduct, and by being substantially involved in placing the spam calls and texts Plaintiffs continue to receive to this day.

## PARTIES

7.      Plaintiff Laura C. De la Cabada is a natural person and a citizen of the State of New Jersey.

8.      Plaintiff Debra Williams is a natural person and a citizen of the State of California.

9.      Defendant Ytel Inc., is a corporation organized and existing under the law of the State of California with its principal place of business located at 94 Icon, Lake Forest, California 92610. Defendant does business in the State of California, this District, and across the country.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, a federal statute.

11.     This Court has personal jurisdiction over Defendant because it transacts business in this State, and because the tortious conduct alleged in this Complaint occurred in, was directed to, and/or emanated from this State.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant conducts business transactions in this District, and because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District. Additionally, Plaintiff Williams, an individual, is a resident of this District and received calls and/or texts at issue in this litigation while residing in this District.

## COMMON FACTUAL ALLEGATIONS

13.     Auto-dialers and robo-texting are now an immutable fact of public life in the United States. A 2019 report from the FCC estimates the annual rate of American robocall volume has

grown from 29,082,325,500 in 2016 to 47,839,232,200 in 2018—a sixty-four percent increase in just two years.[1]

14.     By one measure, 44.6 percent of calls to mobile phones in 2019 will be scams, and nine out of ten will feature "spoof[ed]" area codes (*i.e.*, feature the same area code as the individual called.)[2] Although some new tools have been developed to assist in spam call blocking, the problem persists—and grows—virtually unabated.

15.     This growth has been made possible, in large part, by the development of new calling technologies such as Voice-over-Internet-Protocol (VoIP) services.[3] One such VoIP company is Defendant Ytel.

***Ytel's Robocalling and Text Messaging Operation***

16.     Ytel is a service designed for the creation and execution of telemarketing and text messages campaigns to consumers nationwide.

17.     Defendant's "Ytel Campaign" system, formerly known as "Beacon," is capable of placing large volumes of calls. During the release of Beacon, Ytel described it as "a broadcasting app for voice messaging and ringless voicemail. Within minutes, non-profits, SMB and Enterprise businesses can customize and send recorded messages by phone to dozens, hundreds or thousands of people on-demand."[4] In other words, Ytel provided an auto-dialer capable of delivering pre-recorded messages to consumers' telephones.

18.     To place a prerecorded voice message, Ytel's "voice broadcast" feature "allows the call recipient to receive an automated voice message upon answering the phone. The voice message will then prompt the recipient to take some sort of action, dictated by goals of the broadcast running. You've got their attention…*Make it count!*" *See* <u>Figure 1</u>.[5]

---

[1]     Report on Robocalls, CG Docket No. 17-59, Consumer & Gov't Affairs Bureau F.C.C. (Feb. 2019).

[2]     *Id.*

[3]     *Id.*

[4]     *Ytel Launches Integrated Marketing Application, Beacon*, https://ytel.com/news/2017/03/16/ytel-launches-integrated-marketing-application-beacon.html (last visited October 28, 2019).

[5]     Create a Voice Broadcast | Help Center, https://intercom.help/Ytel_Help/how-to/ytel-campaign-product-formerly-known-as-beacon/create-a-voice-broadcast (last visited October 28,

1

2



3

4

5

6

7

8

9

10

11  (**Figure 1**)

12          19.     When initiating a new "voice broadcast" campaign, Ytel's system allows for the

13  uploading of a voice recording or recording a voice message directly from a web browser.

14          20.     Ytel's system has the capacity to produce numbers to be called, using a random or

15  sequential number generator, and to dial such numbers. The Ytel system also allows for the upload

16  of a file containing a list of phone numbers to dial, stores consumers' phone numbers, and can also

17  dial the stored phone numbers in a sequential or random order. Specifically, the Ytel system can call

18  consumers numbers by (1) first sorting phone numbers by time zone and dialing them in a random

19  manner; (2) dialing the phone numbers from the uploaded list in an entirely random manner; or (3)

20  dialing the phone numbers sequentially—either from top to bottom or from bottom to the top

21  approach. *See* Figure 2.

22

23

24

25

26

27  _____

28  2019).

(**Figure 2**)

21.     Similarly, Ytel's system allows for the creation of telemarketing campaigns by composing and sending text messages, *en masse*, to consumers nationwide. Utilizing the "SMS broadcast" feature allows for the sending of "a text message directly to the recipient's mobile phone." *See* Figure 1.

22.     Like Ytel's voice broadcast feature, Ytel's text messaging system has the capacity to produce numbers to be messaged, using a random or sequential number generator, and to dial such numbers. It also allows for the upload of a list of phone numbers to dial. Ytel then broadcasts, or sends, the message via SMS to the uploaded contact list.

23.     As such, Ytel's calling and texting platform is an automatic telephone dialing system ("ATDS"). As explained above, Ytel's system has hardware and software with the capacity to store, produce, and dial random or sequential numbers, and/or receive and store lists of telephone numbers, and to dial or text them *en masse* in an automated fashion without human intervention.

***Ytel Knows Unlawful Telemarketing Calls and Texts are Placed by its System***

24.     Ytel very clearly understands the importance of the TCPA. In an online blog post titled "How The TCPA Is Affecting Contact Centers," Ytel notes a "sharp increase in the Telephone Consumer Protection Act (TCPA) filings" and warns that "a strong compliance program is essential to help avoid potential class action lawsuits and liability."[6]

---

[6]     *How The TCPA Is Affecting Contact Centers*, https://ask.ytel.com/how-the-tcpa-is-affecting-contact-centers (last visited October 28, 2019).

25.     Ytel also knows that many telemarketing campaigns do not comply with the TCPA. In a blog post, Ytel writes, "[a] substantial challenge of SMS marketing is the fact that consumers receive more than 5,000 marketing messages every day. How many of those are actually following FTC and other government rules and regulations? It's hard to say, but we can assume that a large amount of companies don't follow regulations and send at their own leisure."[7]

26.     Yet, Ytel does not have to assume that a "large amount of companies don't follow" the TCPA, because it has direct and actual knowledge that entities like Manasseh Jordan Ministries, discussed below, and potentially many other Ytel partners, placed prerecorded calls and text messages to consumers nationwide without first obtaining the caller's consent. Still, Ytel knowingly facilitated these calls in violation of the TCPA.

27.     Ytel has first-hand knowledge about the active calling campaigns on its system. On its website, Ytel touts that "in-house compliance experts provide safeguards to guide [its customers] through best practice in communications to ensure confident delivery." *See* <u>Figure 3.</u> Ytel further states, "[o]ur in-house carrier compliance team works directly with our customers to ensure they're sending messages and running campaigns that are compliant and within the standards set by the FTC and TCPA."[8]



**Compliance**

Our in-house team of compliance experts provide safeguards to guide you through best practices in communications to ensure confident delivery.

**(Figure 3)**

---

[7]     *SMS Campaigns: Compliance Guidelines*, https://ask.ytel.com/sms-campaigns-compliance-guidelines (last visited October 28, 2019).

[8]     *Power SMS Marketing Campaigns for Your Business*, https://ask.ytel.com/ytel-api-sms (last visited October 28, 2019).

28.     Furthermore, Ytel provides its partners an account manager that help operate the Ytel calling system. Ytel account managers not only oversee their partners' accounts (and the telemarketing campaigns they execute) but also aid in building SMS and calling functionalities into their own apps. *See* <u>Figures 4 and 5</u> (showing Ytel employees' LinkedIn profile pages).



Experience

**Account Manager**
Ytel
Feb 2018 – Present · 1 yr 4 mos
Foothill Ranch

• Oversee assigned customer accounts and support customers in their business needs as related to Ytel's software products.
• Educate customers on Ytel's products and assist them in their implementation.
• Communicate regularly with assigned customers.
• Develop, maintain, and continuously improve relationships with customers.
• Work with Technical Account Managers and Sales to ensure customer satisfaction and success with Ytel products.
• Grow existing accounts, finding ways to leverage other Ytel products in their environment.
• Maintaining excellent levels of service for customers. See less

**(Figure 4)**



Experience

**Product Manager**
Ytel
Jul 2018 – Present · 11 mos
Foothill Ranch, California

Helping companies successfully build SMS and voice capabilities into their application.

**(Figure 5)**

29.     Despite its telemarketing campaign oversight, Ytel allowed pre-recorded calls and text messages to be sent without first obtaining prior express consent from consumers.

***Ytel Executes Calling and Texting Campaigns***

30.     In addition to Ytel's policy of turning a blind eye to unlawful calling practices, Ytel directly participates in executing calling and texting campaigns by bypassing carrier filtering and using deceptive calling tactics.

31.     Ytel assists in providing a short code—which is a 5 to 6-digit phone number—for use in text messaging campaigns. According to Ytel, short codes are best used for high volume SMS campaigns and are not subject to blocking or filtering by cell phone carriers for heavy volume calling. *See* Figure 6.[9]

> **WHY USE SHORT CODE?**
> - Best used for high volume SMS campaigns
> - Primarily used for marketing and transactional messages
> - Not subject to carrier filtering/blocking for heavy volume

**(Figure 6)**

32.     That means Ytel partners, like MJM, who acquire a short code can send mass text messages to consumers nationwide and avoid the risk of telecommunication carriers blocking their text message campaigns.

33.     Ytel also allows for the "spoofing" of outgoing phone numbers to match the recipient's local phone number. Ytel explains that this feature enables its partners to "[e]stablish a local presence by using a phone number that matches your recipients [sic] area code." *See* Figure 7.

**Local Numbers**

(949)

Establish a local presence by using a phone number that matches your recipients area code.

**(Figure 7)**.

34.     Such a tactic is a deliberate attempt by the caller to trick the recipient into picking up the phone. Consumers often don't answer phone calls from phone numbers with unfamiliar area

---

[9]     *How to Choose the Right Short Code*, https://ask.ytel.com/hubfs/Product/Sales%20Tools/Infographic/2018_03_ShortCodeInfographic.pdf (last visited October 28, 2019).

codes or from phone numbers with no caller ID information. But a consumer is more likely to pick up a phone that appears to originate from his or her area.

35.     Similarly, Ytel's provides random selections of numbers for bulk purchase. Ytel sells these phone numbers in increments of 25 and up to 200 numbers at once. *See* <u>Figure 8</u>.



**(Figure 8)**

36.     Armed with hundreds—even thousands—of different telephone numbers, Ytel and its partners can execute telemarketing campaigns that are difficult to avoid. In other words, telemarketers can place multiple phone calls, each from a different number, to avoid built-in phone number blocking systems. Even if a consumer blocks one phone number, calls can continue unabated from hundreds of other numbers.

37.     Indeed, Ytel and its tools played an integral role in spamming of millions of phones with recorded messages and texts featuring automated messages from the so-called "prophet" Yakim Manasseh Jordan, discussed below. For its text messaging campaigns, Ytel provided Manasseh Jordan Ministries ("MJM") with custom short codes to avoid being blocked by recipients' cell phone carriers. Further, Ytel provided MJM hundreds of local phone numbers in order to place pre-recorded calls to consumers, *en masse,* and avoid built-in call blocking features.

***Ytel and MJM Partnered To Place Millions of Unsolicited Calls and Texts***

38.    Yakim Manasseh Jordan claims to be a prophet and founded MJM. Manasseh has appeared several times on religiously-themed television programs to preach what is commonly known as the "prosperity gospel." He solicits millions of dollars from primarily low-income people, commonly known as "seed-faith," which he promises will purchase a "favor" from God.

39.    Not surprisingly, Manasseh uses the same money-for-miracles storytelling techniques in his prerecorded calls and messaging campaigns. For example, he has told millions of call recipients, in his own prerecorded voice, "the Lord spoke to me personally about you. I must speak to you. I'm going to pass the phone to my blessed assistant and he's [going to] give you my blessed number so that you can call me back so that you can hear this blessed word."

40.    In a Ytel-partnered text messaging campaign, MJM told call recipients that "GOD is Exposing those that are for you and against you, ALL for YOUR GOOD Listen Click Prophetmanasseh4u.com." *See* Figure 9.



**(Figure 9)**

41.    By following the link, the call recipient will hear a voice recording of Manasseh preaching the so-called "prosperity gospel," where Manasseh inevitably solicits the call recipient to "sow your seed" and make a donation to MJM via PayPal.

42.     Unfortunately, MJM and its exclusive partner Ytel placed *millions* of these prerecorded phone calls and text messages to the cell phones of consumers nationwide. The recipients of these prerecorded phone calls and text messages did not consent to be called by Manasseh, MJM, or Ytel in any way whatsoever.

43.     Ytel knows full well what MJM's business model is, both because it understood its purpose in utilizing its auto-dialer platform in the first instance, and additionally through publicly available sources and other forms of notice.

44.     Indeed, the FCC issued a citation letter to MJM in 2016 for making calls using an automatic telephone dialing system or an artificial or prerecorded voice without first obtaining prior express consent of the caller.[10]

45.     MJM and Manasseh have also been sued for violating the TCPA no fewer than *sixteen times* since 2013 alone, agreeing to settle at least one case, and admitting in a third that they "sent prerecorded calls to people."[11]

46.     Further, Plaintiff De la Cabada recently obtained an individual default judgment against Manasseh and MJM for violating the TCPA—although for different contacts than are at issue in this litigation (*i.e.*, Manasseh and MJM continued to illegally text and call her during the pendency of that case—as to De la Cabada, this case is about texts and calls she received after 2017).

47.     In that case, the Plaintiffs produced evidence that MJM, in conjunction with Ytel, was able to make over *160 million* robocalls to consumers in just two years.[12]

---

[10]     *FCC Issues Citation to Manasseh Jordan for Robocalls to Cell Phones,* https://www.fcc.gov/document/fcc-issues-citation-manasseh-jordan-robocalls-cell-phones (last visited October 30, 2019).

[11]     *See* Answer of Defendants Manasseh Jordan Ministries and Yakim Manasseh Jordan to Class Action Complaint ¶¶ 18–23, *Romack, et al. v. Yakim Manasseh Jordan, et al.*, 3:13-cv-02484 (N.D. Ohio Nov. 8, 2013); Brandy Zadrozny, *He'll Raise You From the Dead for $1,000*, Daily Beast (March 20, 2016), https://bit.ly/2VJh0vU (MJM and Manasseh sued "16 times in federal court" for robocalling between 2013 and March 2016).)

[12]     *Molitor, et al. v. Yakim Manasseh Jordan, et al.*, No. 1:16-cv-02106, dkt. 130 (N.D. Ill. Apr. 28, 2019); *cf. id.*, dkt. 123, at 1–2.

48.     And Ytel was aware of this conduct all along. At the very least, during the pendency of the *Molitor* matter referenced above, in early 2017, counsel for Plaintiff De la Cabada provided Ytel with repeat notice of the lawsuit, the substance of its allegations, and extensive evidence of the overall conduct of MJM described herein. Ytel has unquestionably been aware of MJM's conduct, and its own role in it, for many years.

49.     Yet, despite the perpetual legal action against it for making hundreds of millions of illegal calls and texts, MJM, along with Ytel, continues to make harassing pre-recorded calls and sends text messages to consumers without first obtaining their prior express consent.

**FACTS SPECIFIC TO PLAINTIFF DE LA CABADA**

50.     For several years, Plaintiff De la Cabada has received large numbers of pre-recorded calls and text messages to her cellular phone from MJM. These calls were accompanied by voicemails in which a recording of a male voice requests the listener to call 678-405-9374 so that he could "tell you what Master Jesus has been whispering into my ear." This recording included no opt out number to stop receiving phone calls.

51.     In an effort to evade these harassing calls from MJM, De la Cabada blocked some of MJM's phone numbers. But, MJM circumvented Plaintiff De la Cabada's efforts and continued to call and text her from different phone numbers. *See* Figure 10.

**(Figure 10)**

52.    In an effort to finally end the harassing calls and texts, on June 20, 2016 De la Cabada filed a lawsuit against MJM and Manasseh seeking damages and an injunction requiring them to cease all unsolicited calling activities. As they failed to defend in this action, a default judgment was entered against them on March 22, 2019, awarding $207,000 to De la Cabada for damages from 138 calls that she received prior to filing her complaint.

53.    This measure did not deter MJM in the slightest, as they continued to relentlessly call and text De la Cabada well after she filed her claim. *See* Figures 11–12.





**(Figure 11)**                    **(Figure 12)**

54.    Plaintiff De la Cabada does not have a relationship with MJM or Ytel, and has never provided them with her phone number, or with any consent—written or otherwise—to call her cell phone.

### FACTS SPECIFIC TO PLAINTIFF WILLIAMS

55.    Plaintiff Williams, a resident of Oakland, California, has received automated calls and texts from MJM (knowingly supported by Ytel) for years. Indeed, Williams received an automated text message from MJM as recently as this past year, and an automated, pre-recorded call from MJM as recently as July 2019.

56.    Williams has previously tried to verbally tell MJM to stop calling her—to no avail. MJM's robocalls and texts, using Ytel's platform and knowingly supported by Ytel, have continued undisturbed.

57.    Plaintiff Williams does not have a relationship with MJM or Ytel, has never provided them her current phone number, or given consent to call her cell phone.

**CLASS ALLEGATIONS**

58.    **Class Definition:** Plaintiffs De la Cabada and Williams bring this action pursuant to Federal Rule of Civil Procedure (b)(2), and (b)(3) on behalf of themselves and the Classes defined as follows:

> **Pre-Recorded Voice Class:** All persons in the United States who received one or more pre-recorded calls from MJM.

> **Text Message Class:** All persons in the United States who received one or more text messages from MJM.

Excluded from the Pre-Recorded Voice Class and the Text Message Class (collectively the "Classes," unless otherwise indicated) are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

59.    **Numerosity:** The exact number of members of the Classes is unknown and not available to the Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendant made pre-recorded calls and sent text messages to thousands of consumers who fall into the definition of the Classes. Class members can be identified through Defendant's records.

60.    **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

1    **Pre-Recorded Voice Class**

2        a.   Whether Defendant's conduct violated the TCPA;

3        b.   Whether Defendant's made pre-recorded calls to consumers who did not

4             previously provide prior express consent to receive these calls;

5        c.   Whether Defendant knowingly allowed its client(s) to use its cloud calling

6             platform for unlawful purposes; and

7        d.   Whether Plaintiffs and the members of the Class are entitled to treble damages.

8    **Text Message Class**

9        a.   Whether Defendant's conduct violated the TCPA;

10       b.   Whether Defendant's clients sent text messages using an ATDS, as contemplated

11            by the TCPA;

12       c.   Whether Defendant knowingly allowed its client(s) to use its cloud calling

13            platform for unlawful purposes; and

14       d.   Whether Plaintiff and the members of the Class are entitled to treble damages.

15       61.   **Typicality:** Plaintiffs' claims are typical of the claims of other members of the

16   Classes, in that Plaintiffs and members of the Classes sustained damages arising out of Defendant's

17   uniform wrongful conduct.

18       62.   **Adequate Representation:** Plaintiffs will fairly and adequately represent and

19   protect the interests of the Classes, and have retained counsel competent and experienced in

20   complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other

21   members of the Classes. That is, Plaintiffs and members of the Classes sustained damages as a

22   result of Defendant's uniform conduct. Plaintiffs also have no interests antagonistic to those of the

23   Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are

24   committed to vigorously prosecuting this action on behalf of the members of the Classes, and have

25   the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the

26   Classes.

27

28

63.    **Policies Generally Applicable to the Classes:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes as wholes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Classes, and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's practices challenged herein apply to and affect members of the Classes uniformly, and Plaintiffs' challenge of those practices hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

64.    **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendant's misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

**FIRST CAUSE OF ACTION**
**Violation of 47 U.S.C. § 227**
**(On behalf of Plaintiffs and the Pre-Recorded Voice Class)**

65.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

66.    Ytel, together with MJM, placed pre-recorded voice calls to Plaintiffs' and the Class members' cellular telephone without their prior express consent.

67.    Ytel's calling system was an integral part in making millions of MJM pre-recorded voice calls.

68.    By knowingly working with MJM to make these pre-recorded voice calls to Plaintiffs' and members of the Class's cellular telephones without prior express consent, and by having full knowledge for a period of years of the illegality of those calls, Defendant Ytel violated 47 U.S.C. § 227(b)(1)(A)(iii); *cf.* 47 C.F.R. § 64.1200(a)(4)(vii); *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 FCC Rcd. 6574, 6584 (2013) (company can be held liable under TCPA "for certain third-party telemarketing calls ... under federal common law principles of agency ... including not only formal agency, but also principles of apparent authority and ratification."); *see also e.g.*, *Hurley v. Messer*, No. CV 3:16-9949, 2018 WL 4854082, at *4 (S.D.W. Va. Oct. 4, 2018) (TCPA claim stated where calling platform knew of illegal conduct but allowed third-party to continue to use platform).

69.    Specifically, Ytel knowingly joined its software with MJM's devices and allowed it to create and send hundreds of thousands of calls featuring a prerecorded voice to Plaintiffs' and members of the Class's cellular telephones without prior express consent, provided help and advice to MJM on how to do effectuate and send these calls, helped MJM spoof its telephone numbers to aid in bypassing the spam filters of cellular telephone carriers, and did so all while knowing that MJM was using its system to violated the TCPA.

70.    As a result of Ytel's unlawful conduct, Plaintiffs and the members of the putative Class suffered actual damages and have also had their rights to privacy adversely impacted. Plaintiffs and the Class are therefore entitled to, among other things, a minimum of $500 in statutory damages for each such violation under 47 U.S.C. § 227(b)(3)(B).

71.    Because Ytel's misconduct was willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by the Plaintiffs and the other members of the putative Class.

72.     Additionally, as a result of Ytel's unlawful conduct, Plaintiffs and the other members of the Class are entitled to an injunction under 47 U.S.C. § 227(b)(3)(A) to ensure that Ytel's violations of the TCPA do not continue into the future.

**SECOND CAUSE OF ACTION**
**Violation of 47 U.S.C. § 227**
**(On behalf of Plaintiffs and the Text Message Class)**

73.     Plaintiff incorporate the foregoing allegations as if fully set forth herein.

74.     Ytel, together with MJM, sent unwanted and unsolicited text messages to Plaintiffs' and the Class members' cellular telephone without their prior express consent.

75.     Ytel's texting system was an integral part in sending millions of MJM text messages.

76.     Ytel's equipment used to send the text messages has the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and/or receive and store lists of phone numbers, and to dial such numbers *en masse*.

77.     The text messages were sent utilizing equipment that sent the text messages to Plaintiffs and other members of the putative Class simultaneously and without human intervention.

78.     By knowingly working with MJM to send text messages to Plaintiffs' and members of the Class's cellular telephones without prior express consent, by having those text messages sent utilizing an ATDS, and by having full knowledge for a period of years of the illegality of those texts, Defendant Ytel violated 47 U.S.C. § 227(b)(1)(A)(iii).

79.     Specifically, Ytel knowingly joined its software with MJM's devices and allowed it to create and send hundreds of thousands of text messages to Plaintiffs' and members of the Class's cellular telephones without prior express consent, provided help and advice to MJM on how to effectuate and send these text messages, provided MJM with a custom short code telephone number to aid in bypassing the spam filters of cellular telephone carriers, and did so all while knowing that MJM was using its system to violated the TCPA.

80.     As a result of Ytel's unlawful conduct, Plaintiffs and the members of the putative Class suffered actual damages and have also had their rights to privacy adversely impacted.

1   Plaintiffs and the Class are therefore entitled to, among other things, a minimum of $500 in

2   statutory damages for each such violation under 47 U.S.C. § 227(b)(3)(B).

3        81.   Because Ytel's misconduct was willful and knowing, the Court should, pursuant to

4   47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by the Plaintiffs and the

5   other members of the putative Class.

6        82.   Additionally, as a result of Ytel's unlawful conduct, Plaintiffs and the other members

7   of the Class are entitled to an injunction under 47 U.S.C. § 227(b)(3)(A) to ensure that Ytel's

8   violations of the TCPA do not continue into the future.

9                          **PRAYER FOR RELIEF**

10       WHEREFORE, Plaintiffs De la Cabada and Williams, individually and on behalf of the

11   Classes, pray for the following relief:

12       (a)   An order certifying the Classes as defined above, appointing Plaintiffs as the

13   representatives of the Classes, and appointing their counsel as Class Counsel;

14       (b)   An order declaring that Ytel's actions, as set out above, violate the TCPA;

15       (c)   An order declaring that the telephone calling equipment used to send the text

16   messages at issue here constitutes an automatic telephone dialing system under the TCPA;

17       (d)   An order declaring that Ytel knowingly allowed its client(s) to use its calling

18   platform to place unsolicited calls in violation of the TCPA;

19       (e)   An injunction requiring Ytel to cease all unlawful calling activities and enjoining

20   Ytel from using automated or computerized dialing equipment to place text message calls without

21   consent;

22       (f)   An order requiring Ytel to disgorge any ill-gotten funds acquired as a result of its

23   unlawful telephone calling practices;

24       (g)   An award of statutory and treble damages; and

25       (h)   Such other and further relief that the Court deems reasonable and just.

26                          **JURY DEMAND**

27       Plaintiffs request a trial by jury of all claims that can be so tried.

28

---

CLASS ACTION COMPLAINT                                                              21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**LAURA C. DE LA CABADA** and **DEBRA WILLIAMS,** individually and on behalf of all other similarly situated individuals.

Date:   October 30, 2019

By:   _/s L. Timothy Fisher_

L. Timothy Fisher (SBN 191626)
ltfisher@bursor.com
BURSOR & FISHER, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: 925.300.4455
Fax: 925.407.2700

Benjamin H. Richman (*pro hac vice* forthcoming)
brichman@edelson.com
Daniel J. Schneider (*pro hac vice* forthcoming)
dschneider@edelson.com
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312-589-6370
Fax: 312-589-6378

Joseph I. Marchese (*pro hac vice* forthcoming)
jmarchese@bursor.com
Philip L. Fraietta (*pro hac vice* forthcoming)
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, NY 10019
Tel: 646-837-7150
Fax: 212-989-9163

*Counsel for Plaintiffs and the Putative Class*